## STATE OF CONNECTICUT *v.* KEVIN J. MCCOLL
### (AC 20624)

Mihalakos, Flynn and Dupont, Js.

Argued September 17, 2002—officially released January 21, 2003

*Kent Drager*, senior assistant public defender, with whom, on the brief, were *Stephen J. Sczurek* and *Sheri Jones*, certified legal interns, for the appellant (defendant).

*Marjorie Allen Dauster*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Eva B. Lenczewski*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Kevin J. McColl, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), assault of a victim sixty years of age or older in the second degree in violation of General Statutes § 53a-60b (a), and two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3). On appeal, the defendant claims that (1) the evidence was insufficient to sustain his conviction on the assault and robbery counts, (2) the court improperly instructed the jury on "feet and footwear" as a dangerous instrument, (3) the court improperly denied his motion to suppress his confession as the fruit of an illegal entry or as involuntary, (4) the court improperly instructed the jury on intent when the crimes charged were specific intent crimes and (5) the constitutional prohibition against double jeopardy was violated when he was sentenced on two counts of robbery.

The jury reasonably could have found the following facts. The victims, Norman Lezotte, born August 18, 1927, and his wife, Patricia Lezotte, lived in the third floor apartment of a three-family house in Waterbury. On the evening of March 21, 1999, the two went to bed at around 11:30 p.m. At approximately 1:30 a.m. on March 22, 1999, a banging sound from the back of the house, which later proved to be the defendant kicking down the door, awakened them. Norman Lezotte proceeded from the bedroom into the kitchen where he noticed that the rear porch door was open.

Thereafter, the defendant lunged out, grabbing Norman Lezotte by the throat and choking him. Norman Lezotte elbowed the defendant in the stomach and threw two punches at the defendant's head. The defendant then grabbed Norman Lezotte in a chokehold and threw him to the ground. While Norman Lezotte was on the ground, the defendant, who was wearing sneakers, jumped, with two feet, onto Norman Lezotte's back and kicked him about a dozen times in the side and back, and twice in the head. In the course of jumping on and kicking Norman Lezotte with his shod feet, the defendant continually threatened: "If you move, I'll kill you," "If you get up, I'll kill you," and, "Give me the money." Norman Lezotte answered by telling the defendant that his wallet was on the counter with $11 and to take that. The defendant responded by kicking Norman Lezotte and threatening Patricia Lezotte, who by then was standing in the kitchen doorway. Norman Lezotte told his wife to get the money, and the defendant told her to get the money or he would kill her husband.

Patricia Lezotte, who had heard the defendant kicking her husband and saw the defendant with his foot on Norman Lezotte's back, pinning him down, then retrieved from the bedroom an envelope containing approximately $1900. The money was the couple's income tax refund, which had been put aside to pay

various household expenses. Patricia Lezotte gave the money to the defendant. The defendant then demanded, "Give me the phone." Patricia Lezotte obeyed and gave the defendant the telephone. The defendant then demanded that Patricia Lezotte "open the door." She opened the screen door, which she noticed had a hole in it, and then, with the defendant pushing at her back, she opened the latches on a second door, which led down a stairway and out the back. The defendant then left.

After the defendant left, Norman Lezotte called the police from an apartment on the floor below. Initially, Norman Lezotte declined medical treatment, but later in the morning of March 22, 1999, went to the St. Mary's Hospital emergency room, complaining of pain in his back. His injuries consisted of severe bruising to the right side of his back, a bruise to his right ear, and multiple scratches on his back and neck.

On Friday, March 26, 1999, two detectives investigating the crimes at the Lezotte residence went to the home of the defendant and Tracy Fortier, which was next door to the victim's home. As the detectives approached the house, the defendant instructed Fortier to tell the police that the defendant was at home Sunday night into Monday morning, the time of the crimes. After the detectives left, Fortier, having just lied to them by stating that the defendant was home in the early morning of March 22, questioned him as to why he had instructed her to lie. The defendant responded that he had tried breaking into the Lezotte house to look for money to buy drugs. Upon further inquiry from Fortier, the defendant told her that he had not beaten Norman Lezotte, but only held him down.

On April 1, 1999, believing that the defendant had committed the crimes at the Lezotte residence, Fortier went to the police. Thereafter, Sergeant Eugene Coyle,

Detective Nicholas Pesce and three uniformed officers proceeded to Fortier's and the defendant's home where they gained his consent to enter.[1] Once inside, Coyle read the defendant his *Miranda*[2] rights from a pre-printed rights card[3] and asked if he would give the police permission to search the house. The defendant indicated that he knew and understood his rights as they were explained to him. He initialed and signed a consent to search form. Thereafter, the defendant admitted that he was responsible for the burglary, but that he did not have the clothes he wore that night or the money that he stole. He did, however, show the officers the sneakers he was wearing at the time of the crimes.

After being in the home for ten to fifteen minutes, the detectives asked if the defendant would be willing to give a statement at the Waterbury police station. The defendant agreed and Coyle and Pesce transported him, uncuffed, to the station in an unmarked police vehicle. At the police station, the defendant turned over the sneakers, which he had brought from his home, and was placed in an interview room, where Coyle took his

---

[1] The facts related to the defendant's consent are set forth in part II A, in which we discuss the court's denial of the defendant's motion to suppress.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The preprinted card reads: "The constitution requires that I inform you of your rights: You have the right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court.

"You have a right to consult with a lawyer before you are questioned and may have him with you during questioning.

"If you cannot afford a lawyer one will be appointed for you, if you wish, before any questioning.

"If you wish to answer questions, you have the right to stop answering at any time.

"You may stop answering at any time if you wish to talk to a lawyer, and may have him with you during any further questioning. . . .

"Do you understand these rights?

"Are you willing to waive (give up) these rights and answer my questions?"

statement.[4] Additional facts will be set forth as necessary.

## I

## DANGEROUS INSTRUMENT CLAIMS

We first discuss the defendant's claims that there was insufficient evidence to support his conviction of assault of a victim sixty years of age or older in the second degree and of two counts of robbery in the first degree, and that the court's jury instructions as to his "feet and footwear" as a dangerous instrument were improper.[5]

The defendant did not file a request to charge the jury and did not object to the court's instructions about his "feet and footwear." He therefore seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the record is adequate for review and the claim of improper jury instructions on an essential element of the crimes charged alleges the violation of a fundamental right, we conclude that the defendant's claim satisfies the first two prongs of *Golding* and is reviewable. See *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994). We will, therefore, consider whether the alleged constitutional violation clearly exists and, if so, whether it denied the defendant a fair trial.

---

[4] The facts surrounding the defendant's statement are set forth in part II B, in which we discuss the voluntariness of the defendant's confession.

[5] Usually, we would first address the defendant's sufficiency of the evidence claims because if the defendant were to prevail on those claims, he would be entitled to a judgment of acquittal on his conviction of assault of a victim sixty years of age or older in the second degree and of two counts of robbery in the first degree. See *State* v. *Smith*, 73 Conn. App. 173, 178, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002). Because the defendant's claim of insufficiency of the evidence, however, is intricately bound to his claim that the court's instructions concerning "feet and footwear" were improper, we will initially discuss the instructions.

"[T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . The charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict." (Internal quotation marks omitted.) *State* v. *Amado*, 254 Conn. 184, 194, 756 A.2d 274 (2000).

The defendant first argues that the court's instructions improperly allowed the jury to find that his foot alone, rather than his "feet and footwear" in combination, was a dangerous instrument. He contends that this was error because as a matter of law, a foot or other body part cannot be considered a dangerous instrument. The state contends that the information, the evidence presented, the arguments by counsel, and the jury instructions all made it clear that the jury was to consider whether the "feet and footwear" in the manner used were a dangerous instrument.

The court instructed the jury on the use and definition of a dangerous instrument within the context of the facts of this case three separate times, in connection with counts two, three and four of the information.[6] The court read the information verbatim as to each

---

[6] Count two alleges assault of a victim sixty years of age or older in the second degree, and counts three and four allege robbery in the first degree.

count. The information, a copy of which the jury had, charged the defendant with the use of "a dangerous instrument, to wit: his feet and footwear . . . ." Additionally, in its instructions, the court told the jury that the state had alleged that the defendant's "feet and footwear" comprised the dangerous instrument.

On one occasion the court used the disjunctive, "feet *or* footwear," rather than the conjunctive, "feet *and* footwear." There was no dispute that the defendant was wearing footwear, however, and considering the charge as a whole, we find that it was not reasonably possible that the misstatement, "feet or footwear," misled the jury to believe that the defendant was barefoot or to consider whether an unshod foot could be a dangerous weapon.[7]

The defendant's second argument is that the court should have instructed the jury to consider whether his footwear, separate from his foot, was a dangerous instrument.[8] He contends that a "dangerous instrument," as defined by General Statutes § 53a-3 (7), cannot include a body part because it is not an "instrument, article or substance which, under the circumstances in which it is used . . . is capable of causing . . . serious physical injury . . . ." General Statutes § 53a-3 (7). The state contends that the footwear cannot be separated from the foot because when determining if something is a dangerous instrument under § 53a-3 (7), the

---

[7] Because the jury was not misled into considering whether the defendant's foot alone was a dangerous instrument, it is unnecessary, at this point, to address the defendant's argument that as a matter of law a foot cannot be a dangerous instrument.

[8] This argument depends on the underlying argument that a foot alone, as a matter of law, cannot be a dangerous instrument. Because the information, the evidence presented and our finding on the previous issue all make it clear that whether the foot alone was a dangerous instrument was never at issue in this case, we view the defendant's argument as if he were asking us to conclude that, as a matter of law, the feet and footwear could not be a dangerous instrument.

question is whether the instrument, that is, the "feet and footwear" of the defendant, as used, was capable of causing serious physical injury.

"Instrument" is not defined in the General Statutes. One dictionary provides that an instrument is "a means whereby something is achieved, performed or furthered." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

Using that definition, we conclude that an ordinary object may be a dangerous instrument. Therefore, "[e]ach case must be individually examined to determine whether, under the circumstances in which the object is used or threatened to be used, it has the potential for causing serious physical injury." (Internal quotation marks omitted.) *State* v. *Barnett*, 53 Conn. App. 581, 590, 734 A.2d 991, cert. denied, 250 Conn. 918, 738 A.2d 659 (1999). The question of whether in the given circumstances a particular object was used as a dangerous instrument is a question of fact for the jury. *State* v. *Mercer*, 29 Conn. App. 679, 682–83, 617 A.2d 916 (1992), cert. denied, 225 Conn. 902, 621 A.2d 285 (1993); see, e.g., *State* v. *Sawicki*, 173 Conn. 389, 392–94, 377 A.2d 1103 (1977) (state permitted to present testimony that defendant's shod foot was dangerous instrument); *State* v. *McFadden*, 25 Conn. App. 171, 173–75, 593 A.2d 979 (jury allowed to consider whether shod foot, fist, cement floor or combination of any was used as dangerous instrument under facts of case), cert. denied, 220 Conn. 906, 593 A.2d 972 (1991); *State* v. *Johnson*, 14 Conn. App. 586, 597, 543 A.2d 740 ("jury could reasonably have concluded that the defendant's act of kicking the victim with his shod foot was, under the circumstances, the use of a deadly instrument"), cert. denied, 209 Conn. 804, 548 A.2d 440 (1988).

We conclude that "feet and footwear" can be a dangerous instrument in some circumstances. As the court

properly instructed, the question of whether the defendant's "feet and footwear" were a dangerous instrument is a question for the jury's consideration under the given circumstances.

Having concluded that "feet and footwear" can be a dangerous instrument in some circumstances, and that the court's instructions on "feet and footwear" were not improper, we next consider whether the evidence in this case was sufficient to allow a jury to so conclude.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002).

The defendant claims that the evidence was insufficient to support his conviction of assault of a victim sixty years of age or older in the second degree and of two counts of robbery in the first degree. Although each of those crimes has several elements, the defendant challenges the sufficiency of the evidence only as it relates to the dangerous instrument elements of those crimes. First, with respect to both counts of robbery, he argues that the evidence was insufficient to find that a dangerous instrument was used. He further argues with respect to these counts that the evidence was insufficient to show that his threats related to the use of a dangerous instrument.[9] Last, regarding the assault

---

[9] Under General Statutes § 53a-134 (a) (3), it was necessary that the state prove only that a dangerous instrument was used *or* threatened to be used. We conclude, however, that the state could have prevailed either as to the use or threat.

count, he argues that the evidence was insufficient to prove that the dangerous instrument caused the injuries to Norman Lezotte.

The evidence adduced at trial reveals that during the break-in at the Lezotte residence, the defendant, who was wearing sneakers at all times, repeatedly kicked Norman Lezotte in the head and back. The defendant at the time was five feet, eleven inches tall, weighing 195 pounds. The victim was a seventy-one year old man with a heart condition.

Peter Jacoby, a physician, testified that the area that the defendant continually kicked contains several vital organs, including the lungs and kidneys. He further testified that repeated kicks to those organs could cause serious internal injuries, which could result in death, especially of an older victim. He testified that any increased weight on the foot, including a sneaker, would have increased the force that the defendant inflicted on the victim's midsection.

Additionally, the evidence showed that the defendant at all times either was kicking the victim or had his foot on the victim to prevent him from getting up or fighting back. When the defendant demanded money from Norman Lezotte and he did not comply, the defendant kicked him. Last, when the defendant threatened the Lezottes and demanded money from Patricia Lezotte, who had heard the defendant kicking her husband, the defendant had his foot on Norman Lezotte's back.

From that evidence, the jury reasonably could have found that the defendant's "feet and footwear" were a dangerous instrument because under the circumstances in which they were used or attempted or threatened to be used, the repeated kicking of the victim in the midsection rendered the defendant's "feet and footwear" capable of causing death or serious physical injury. The jury reasonably could have found that the

"feet and footwear" were a dangerous instrument in the manner in which they were used because of the size of the defendant, the age and health condition of the victim, the location of the kicking, and the number and force of the kicks, which was intensified by the weight of the footwear.

Additionally, for the purpose of the robbery counts, because the defendant continually used his "feet and footwear" to restrain, incapacitate and kick Norman Lezotte in an attempt to take the Lezottes' money, it was reasonable for the jury to find that the defendant had used or threatened the use of a dangerous instrument while in the course of a larceny. Further, in relation to the assault count, it was reasonable for the jury to find that the defendant had used a dangerous instrument, his "feet and footwear," to cause physical injury to the victim.

We therefore conclude that the evidence was sufficient to find the defendant guilty of the assault count and the two robbery counts.

## II

### MOTION TO SUPRESS THE CONFESSION

The defendant next claims that the court improperly denied his motion to suppress his confession. Specifically, the defendant argues that the confession was the fruit of an illegal and warrantless entry into his home[10] and that it was involuntary. We disagree.

---

[10] The defendant also claims that his sneakers were the fruit of the same warrantless entry and also should have been suppressed. In light of our conclusion regarding the legality of the entrance into the defendant's home, it is not necessary to review that claim. Further, the defendant did not raise his claim in the trial court, and the record is not adequate for review under *Golding* because the court did not make any findings and was not presented with any evidence related to the suppression of the defendant's sneakers.

## A

## Validity of Police Officer's Entry

The defendant argues that the police unlawfully entered his home in violation of article first, § 8, of the constitution of Connecticut[11] and the fourth amendment to the United States constitution.[12] We initially note that the defendant does not dispute the court's factual findings. Instead, he argues that such findings do not give rise to a finding of voluntary consent to enter his dwelling and, therefore, that any evidence obtained subsequent to the officers' entry should have been suppressed.

In its memorandum of decision on the defendant's motion to suppress, the court found the following relevant facts related to the voluntariness of the defendant's consent. On April 1, 1999, Fortier went to the police station and informed the police that she believed the defendant was responsible for the burglary at the Lezotte residence. The police indicated that they were going to search for the defendant.

Later that same morning, Coyle, Pesce and a uniformed officer knocked on the side door of the defendant's home.[13] When the defendant opened the door, it appeared to the officers that the defendant had just gotten out of bed, but there was no indication that he

[11] In his principal brief, the defendant invoked both the United States constitution and the constitution of Connecticut. Because he has not provided a separate and distinct analysis of his claim under the state constitution, we address only his federal constitutional claim. See *State* v. *Joyce*, 243 Conn. 282, 288 n.6, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

[12] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[13] Coyle testified that prior to the police going to the defendant's home, the officers searched for him at his son's school.

was under the influence of any drugs or alcohol. Coyle informed the defendant that the police were investigating a burglary.[14] The defendant turned back into the house, and the detectives followed him, stepping into the kitchen.[15] The defendant never objected to the police entry or presence in his home and was fully cooperative thereafter. On the basis of those facts and the testimony of the officers, the court concluded that the entry was consensual.

"The touchstone of the Fourth Amendment is reasonableness. . . . The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." (Citation omitted.) *Florida* v. *Jimeno*, 500 U.S. 248, 250, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991). Searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). However, "[i]t is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Therefore, a "warrantless search or entry into a house is not unreasonable . . . under the fourth amendment to the United States constitution . . . when a person with authority to do so has freely consented." (Internal quotation marks omitted.) *State* v. *Martinez*, 49 Conn. App. 738, 743, 718 A.2d 22, cert. denied, 247 Conn. 934, 719 A.2d 1175 (1998); see also *State* v. *Wragg*, 61 Conn. App. 394, 401, 764 A.2d 216 (2001).

"To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine

---

[14] Coyle testified that the defendant personally knew him as a police officer and that the defendant could see the uniformed officer who was accompanying Coyle.

[15] Coyle testified that he asked the defendant, "Can we come in and talk to you?" to which the defendant responded by allowing the officers to enter.

whether the consent was [the] product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." (Internal quotation marks omitted.) *United States* v. *Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). "The voluntariness of the consent is . . . decided by the trial court based on the evidence it deems credible along with the reasonable inferences that can be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 49 Conn. App. 743. "Voluntariness may not be established simply by a showing of acquiescence to a police officer's order to allow entry; such consent, however, need not be expressed in a particular form but can be found from an individual's words, acts or conduct." (Internal quotation marks omitted.) *United States* v. *Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993). "The ultimate question is whether the will of the consenting individual was overborne . . . ." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 743.

An examination of other cases bolsters our conclusion that the motion to suppress was denied properly. This court in *State* v. *Boyd*, 57 Conn. App. 176, 182, 749 A.2d 637, cert. denied, 253 Conn. 912, 754 A.2d 162 (2000), upheld a finding of consent because the defendant through words, acts and conduct revealed that his consent was freely given. In *Boyd*, an officer approached the defendant's apartment door with his gun drawn, and the defendant, who had been involved with the system previously, opened the door without the officer's knocking. Id., 178–79. The defendant was extremely polite and cooperative, knew why the police were there, and invited them in after they explained their purpose and asked to look around. Id., 182. This court concluded that throughout the time the police were present, the defendant had provided consent on repeated occasions, and there were no signs of coercion or duress. Id.

In *State* v. *Cardona*, 6 Conn. App. 124, 132, 504 A.2d 1061 (1986), this court upheld a finding of consent where four officers had knocked on the door of a house in which the defendant was present, a woman answered and, while opening the door wider, gestured toward the upstairs when the police inquired as to the whereabouts of the defendant. The court noted that there was no objection or any indication of coercion. Id., 134–35; see also *United States* v. *Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) (consent found where officers rang doorbell, defendant answered by opening inside door, officers identified selves, defendant stepped back allowing officers to open screen door, enter).

The defendant asserts that the present case parallels *United States* v. *Shaibu*, 920 F.2d 1423 (9th Cir. 1990), rather than the previously discussed cases. We disagree. The *Shaibu* court held that the state cannot show consent to enter merely from the defendant's failure to object. Id., 1428. *Shaibu*, however, is factually distinguishable from this case. In *Shaibu*, the officers initially rang the bell and did not respond to the defendant's asking who was there. Id., 1424. After the defendant buzzed the officers in, he made a point to step out of and away from his apartment to meet the officers in the hallway. Id. Upon an officer identifying himself, the defendant walked back into the apartment where the officers followed through an open door. Id. The United States Court of Appeals for the Ninth Circuit, specifically noting the failure of the police to request to enter, determined that the defendant's failure to object was a submission to authority rather than voluntary consent. Id., 1427–28.

Contrary to the facts in *Shaibu*, in this case, the defendant's conduct was not a submission to authority, and his failure to object was not the only fact underlying the court's finding of consent. Specifically, in contrast to *Shaibu*, the defendant did not meet the officers out-

side his house. Second, unlike the officers in *Shaibu*, the officers in this case identified the reasons for their presence, stated that they wanted to talk to the defendant and requested entry. Therefore, because of the defendant's knowledge and understanding of the situation and what the police wanted, when he walked from the door and allowed the officers entry, it was an affirmative action indicating his consent to the entry. In *Shaibu*, however, the only affirmative action by the defendant was his walking away from the officers upon their identifying themselves.

Following a full hearing on the defendant's motion to suppress, the court concluded that the defendant had consented to the police entry because "[t]he credible facts established that the defendant allowed the officers in without any complaint and full cooperation." The court found that the defendant's will was not overborne and his consent was a product of his unconstrained choice. We agree with the court's findings.

The question of whether a defendant has given voluntary consent to enter premises is a question of fact for the trial court upon consideration of the totality of the circumstances surrounding the entry. *State* v. *Ortiz*, 17 Conn. App. 102, 103, 550 A.2d 22, cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988). Given the findings in this case, as previously recited, and with which the defendant does not disagree, we agree with the court. Any evidence obtained as a result of the entry into the defendant's home was not the fruit of an illegal entry and, thus, was admitted properly.[16]

B

Voluntariness of the Defendant's Confession

The defendant argues that his confession given at the police station was involuntary because Coyle promised

[16] Because the entry was valid pursuant to the defendant's consent, it is not necessary to engage in attenuation analysis pursuant to *State* v. *Geisler*,

him a drug treatment program instead of jail if he cooperated.[17] The court found that the defendant's confession was voluntary.

The following facts are relevant to the court's conclusion. After the officers brought the defendant to the police station, Coyle read him his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), for the second time. The defendant proceeded to recount what had occurred in the early morning of March 22, 1999. Coyle typed the statement on a computer screen, which the defendant was able to read as Coyle typed. Coyle had the defendant read out loud the first paragraph to verify that he could read. The defendant did not make any changes while Coyle typed. After finishing, Coyle printed the statement on a voluntary statement form. The defendant read the statement, made no changes, read aloud and initialed the *Miranda* warnings on the top of the form and, under oath, signed the bottom of the statement.[18]

"[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418, 736 A.2d 857 (1999). "[T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." (Internal quotation marks omitted.) Id. The ultimate question is whether the con-

---

222 Conn. 672, 682–83, 610 A.2d 1225 (1992), to determine if the subsequent confession at the police station was tainted.

[17] At the hearing on the defendant's motion to suppress, that argument was one of many raised to support his claim of involuntariness.

[18] The top of the voluntary statement form also contained a clause, which the defendant initialed, indicating that no promises or threats had been made.

fession is the product of an essentially free and unconstrained choice. Id. "If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." (Internal quotation marks omitted.) Id., 418–19.

Initially, the trial court determines whether a statement is voluntary by considering the circumstances surrounding the making of the statement. Id., 419. Factors the court considers include the age, education and intelligence of the accused, whether any advice was given as to constitutional rights, the length of detention, whether the questioning was repeated and prolonged, and whether any physical punishment was used. *State v. Smith*, 65 Conn. App. 126, 142, 782 A.2d 175, cert. granted on other grounds, 258 Conn. 930, 783 A.2d 1032 (2001). "[F]indings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous." (Internal quotation marks omitted.) Id., 141. We, however, make a scrupulous examination and "conduct a plenary review of the record in order to make an independent determination of voluntariness." *State v. Pinder*, supra, 250 Conn. 421; see also *State v. Hafford*, 252 Conn. 274, 299, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000); *State v. Smith*, supra, 142.

In this case, after a hearing on the defendant's motion to suppress, the court found that the defendant was twenty-nine years old, had a high school education, spoke and wrote English, and did not show any signs of physical impairment due to the influence of alcohol or drugs. He was advised of his constitutional rights twice before making his written statement. The defendant appeared to have understood his rights. The defendant gave a signed and sworn statement. Within the statement, he initialed that he had been advised of and

had understood the *Miranda* warnings; he also initialed that he was giving the statement "freely and voluntarily without any threats or promises." The detention of the defendant lasted at most one and one-half hours. Further, the court found that the defendant had given his statement so that he could benefit from a drug treatment program and that he did not testify that he had been subjected to any police pressure. Those facts are amply supported by the record and are not clearly erroneous.

Therefore, except for the alleged promise made by Coyle, the record shows, and the defendant does not dispute, that the confession was freely and voluntarily given. The defendant argues, however, that the court's finding that he had given his statement "for the benefit of obtaining a drug [treatment] program" demonstrates an improper promise by Coyle, which thus rendered the statement involuntary.

In some cases, a promise of leniency may affect the voluntariness of a confession. However, "[a] confession, otherwise freely and voluntarily made, is not vitiated by a promise of leniency unless such promise was the motivating cause of the confession." (Internal quotation marks omitted.) *State* v. *Janice*, 20 Conn. App. 212, 217, 565 A.2d 553, cert. denied, 213 Conn. 811, 568 A.2d 795 (1989).

In regard to the alleged promise made by Coyle, the defendant testified that Coyle offered to get him into a drug treatment program instead of jail if he cooperated. Coyle testified that the defendant indicated his interest in a drug program, but that he made no promises and, in fact, told the defendant that he was unable to get him into a program. The record also discloses that the defendant signed a voluntary statement in which he initialed that he was making the statement without any promises having been made to or threats made against him.

The court heard and evaluated the evidence. In its memorandum of decision, the court found that the defendant's motivation for making the statement was his desire to obtain drug treatment. Thus, it did not find the defendant's testimony regarding Coyle's alleged promise credible. This finding is supported by Coyle's testimony regarding the defendant's interest in a program. We agree that the motivating factor for the defendant's cooperation was the *defendant's wish*, rather than *Coyle's promise*, that the defendant would get into a drug treatment program. That subjective belief does not make his confession involuntary. See, e.g., *State* v. *Rodriguez*, 56 Conn. App. 117, 119–22, 741 A.2d 326 (1999), cert. denied, 252 Conn. 926, 746 A.2d 791 (2000). Having scrupulously examined the record, we conclude that the defendant's confession was voluntarily given.

III

DOUBLE JEOPARDY CLAIM

The defendant's next claim is that his conviction of two counts of robbery in the first degree under § 53a-134 (a) (3), which incorporates § 53a-133 (1) and (2), violated the constitutional prohibition against double jeopardy. We disagree.

"The double jeopardy clause of the fifth amendment to the United States constitution provides: '[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . .' This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy. . . . This constitutional guarantee . . . protects against multiple punishments for the same offense [in a single trial]." (Citations omitted). *State* v. *Ferguson*, 260 Conn. 339, 360–61, 796 A.2d 1118 (2002).

In the context of a single trial, the double jeopardy analysis is a two part process. Id., 361. "First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense." Id.

"[T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." (Internal quotation marks omitted.) Id. "The issue, though essentially constitutional, becomes one of statutory construction. *State* v. *Rawls*, 198 Conn. 111, 120, 502 A.2d 374 (1985); *State* v. *Madera*, 198 Conn. 92, 109, 503 A.2d 136 (1985)." (Internal quotation marks omitted.) *State* v. *Greco*, 216 Conn. 282, 290, 579 A.2d 84 (1990).

"The traditional approach to analyzing whether two offenses constitute the same offense was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)." (Internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 291. Our Supreme Court, however, has decided that "when a defendant is convicted of multiple violations of the same statutory provision," rather than *Blockburger* analysis, "[t]he proper double jeopardy inquiry . . . is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 121, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); *State* v. *Garvin*, 242 Conn. 296, 304, 699 A.2d 921 (1997).

It is clear in this case that the offenses the defendant was convicted of arose out of the same transaction and occurrence. Under relevant law, therefore, to determine whether the two offenses are the same offense for double jeopardy purposes, we must decide whether the

two offenses charged are distinct statutory provisions, requiring *Blockburger* analysis, or the same statutory provision, requiring legislative intent analysis.

With respect to that issue, the defendant argues that the statutory provisions charged are conceptually indistinct and, therefore, *Blockburger* analysis is not required,[19] but instead, legislative intent analysis is necessary. On the contrary, the state argues that § 53a-133 (1) and (2) are distinct statutory provisions and *Blockburger* analysis is all that is required. We agree with the state.

In the information the state charged the defendant with having violated § 53a-134 (a) (3)[20] in that the defendant, "in the course of committing a larceny, used and threatened the immediate use of physical force upon NORMAN LEZOTTE . . . for the purpose of preventing and overcoming resistance on the part of NORMAN LEZOTTE to the taking of a sum of [United States] currency and a telephone." It further charged the defendant with having violated § 53a-134 (a) (3) in that the defendant, "in the course of committing a larceny, used and threatened the immediate use of physical force upon NORMAN LEZOTTE . . . for the purpose of compelling PATRICIA LEZOTTE to deliver up a sum of [United States] currency and a telephone and to unlock a door in order to effectuate his escape from the scene."

The information, in separate counts, accurately tracked subdivisions (1) and (2) of § 53a-133, which

---

[19] In a footnote in his brief, the defendant contends that even if *Blockburger* applies, it would not lead to a different result because the subdivisions are conceptually indistinct and, therefore, the same for *Blockburger* purposes.

[20] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 . . . he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ." Therefore it incorporates the disputed statutory provisions at issue, General Statutes § 53a-133 (1) and (2).

provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

The cases on which the defendant relies for the proposition that those two statutory subdivisions are "conceptually indistinct" are distinguishable. See, e.g., *State v. Scott*, 20 Conn. App. 513, 568 A.2d 1048, cert. denied, 214 Conn. 802, 573 A.2d 316 (1990); *State v. Horne*, 19 Conn. App. 111, 562 A.2d 43 (1989), rev'd on other grounds, 215 Conn. 538, 577 A.2d 694 (1990); *State v. Webb*, 8 Conn. App. 620, 514 A.2d 345 (1986). First, in each case, the questions before the court related to the court's instructions. The questions were, whether, when only one count of § 53a-133 is charged, the court properly instructed the jury and whether, when both subdivisions (1) and (2) are charged, a unanimity instruction is required. Second, each case involved only a threat or use of force against one victim. Third, the factual scenarios in each case were different.

For example, in *State v. Scott*, supra, 20 Conn. App. 518–19, the court held that it was not improper to charge under both subdivisions (1) and (2) because the act of dragging a woman as she was holding the strap of her purse to take the purse away could have satisfied both subdivision (1), overcoming resistance to the taking or the retention of the property, and subdivision (2), compelling the owner to deliver up the property. Under those facts, the states of mind of the defendant were not conceptually distinct. In *State v. Horne*, supra, 19 Conn. App. 134–37, in which the defendant did not actually compel the victim to deliver up property, it was

not error to instruct on both subdivisions because the subdivisions implicate the defendant's purpose rather than what actually happened, and the jury reasonably could have found the defendant's purpose to meet both subdivisions (1) and (2). See also *State* v. *Webb*, supra, 8 Conn. App. 626 (court held that jury charge on both subdivisions [1], [2] proper where statement of essential facts could have implicated either subdivision).

In the present case, unlike the cases cited by the defendant, the facts were such that the statutory provisions charged were conceptually distinct. In a separate trial for the robbery of Norman Lezotte, the court could not have instructed, and the state could not have accurately charged, under subdivision (2) because he was not compelled to deliver up any property or to aid in the commission of the larceny. On the other hand, in a separate trial for the robbery of Patricia Lezotte, subdivision (1) could not have been charged because physical force was not used on her at all.

Having found that the offenses charged as they apply to this case are not the same statutory provision for double jeopardy purposes, we analyze the defendant's claim under *Blockburger*. "[U]nder the *Blockburger* test, a defendant may be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." (Internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 10, 629 A.2d 386 (1993). The term element "means any fact that the legislature has deemed essential to the commission of the crime." Id.

For example, in *State* v. *Tweedy*, 219 Conn. 489, 594 A.2d 906 (1991), the defendant was charged with and convicted of two counts of kidnapping in the first degree after he forced his way into the victim's apartment, demanded money, followed her into her bedroom, received money from her, took a camera, commanded

her to undress and to sit on her bed, took jewelry, sexually assaulted her and thereafter ordered her at gunpoint to an automated teller machine to make a withdrawal to give to him.

The court reasoned that under those facts, there was no double jeopardy violation on the conviction of two counts of kidnapping under General Statutes § 53a-92 (a) (2) (A) and (B)[21] because they were separate offenses. *State* v. *Tweedy*, supra, 219 Conn. 496. In one count, under subdivision (A), the state had to prove that the defendant abducted the victim with the specific intent to violate or to abuse her sexually. Id. In the other count, under subdivision (B), the state had to prove that the defendant abducted the victim with the specific intent to achieve the felonious objective of robbery. Id.; see also *State* v. *Woodson*, supra, 227 Conn. 9 (defendant charged with, convicted of, two counts of arson in first degree under General Statutes § 53a-111 (a) (3), (4) after setting fire to building; applying *Blockburger*, court found no double jeopardy violation because for one count, state had to prove defendant started or caused explosion for purpose of collecting insurance proceeds, and for other count, state had to prove that at scene of fire or explosion, peace officer or firefighter subjected to substantial risk of bodily injury).

In this case, for each of the offenses, the state had to prove a different purpose. In the third count, for the robbery of Norman Lezotte, under subdivision (1), the state was required to prove that the defendant's "purpose" in using force on him was to overcome his resistance to the taking of the property or to the retention thereof immediately after the taking. In the third count,

---

[21] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony . . . ."

for the robbery of Patricia Lezotte, under subdivision (2), the state was required to prove that the force used on another, Norman Lezotte, was for the purpose of compelling the owner of the property or another, Patricia Lezotte, to deliver up the property. Those two elements are different and had to be separately proved for each offense.[22] The proof of each purpose was essential to proving the commission of the crimes under both subdivisions (1) and (2). Therefore, because each statutory provision contains an element that the other does not, they are not the same offense under *Blockburger*. The defendant's double jeopardy protection was not violated.

Although we have concluded that *Blockburger* is the proper test and that under *Blockburger*, double jeopardy was not violated, because the ultimate question in double jeopardy analysis is legislative intent, we briefly comment. See *Blockburger* v. *United States*, supra, 284 U.S. 303. The defendant argues that in enacting § 53a-133, the legislature intended only as many robberies as there are larcenies by force. Therefore, he contends that because there was only one larceny by force, against Patricia Lezotte, only one conviction of robbery can stand. As to legislative intent, the state argues that because robbery is a crime against the person and because there were multiple victims in this case, the legislature intended multiple punishments. We agree with the state.

"A fundamental purpose of the criminal law is to protect individual citizens from the criminal conduct of another. People are neither fungible nor amorphous. Where crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there

---

[22] See General Statutes § 53a-133 (a) (1) and (2).

are victims." (Internal quotation marks omitted.) *State* v. *Lytell*, 206 Conn. 657, 666, 539 A.2d 133 (1988); *State* v. *Ingram*, 43 Conn. App. 801, 818–19, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997).

Although the defendant is correct in arguing that robbery is a larceny by force, he fails to recognize that our robbery statutes aim at the force or threat of force used and where, as here, there are two victims of force, there are two robberies. The robbery statutes "clearly [evince] a legislative intent that robbery is a person and victim oriented crime and, thus, is of a higher order than a crime against property . . . ." *State* v. *Ingram*, supra, 43 Conn. App. 819. "[T]he distinguishing characteristic of [robbery] is the intimidation of the victim. *State* v. *Gaines*, 196 Conn. 395, 400, 493 A.2d 209 (1985) . . . ." (Internal quotation marks omitted.) *State* v. *Ingram*, supra, 820–21. "As concerns § 53a-133, the singular term another person has been construed to evince the legislative purpose that a spatially indistinct robbery of two individuals be punishable as two separate offenses of robbery." (Internal quotation marks omitted.) Id., 821.

A distinction in this case, not recognized by the defendant is that subdivision (2) allows an individual to be the victim of a robbery without having been personally subject to a threat or to the use of force at all. In this case, Patricia Lezotte was the victim of a robbery because one of the defendant's purposes in using force on her husband was to compel her to give up property and to open the door latches for him to leave. That intimidation of the victim is one of the targets of the robbery statute. The defendant's other purpose in using force was to make Norman Lezotte the victim of a robbery by preventing his resistance to the larceny. Those facts demonstrate two different purposes of the defendant, which resulted in the intimidation of two different victims, Norman Lezotte, who was forced to

let the defendant take the property, and Patricia Lezotte, who was forced to give up the property to the defendant. The words of the statute evince the legislative intent to punish those two offenses separately.

"While double jeopardy prohibits multiple punishments for the same offense, distinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Internal quotation marks omitted.) *State* v. *Ferguson*, supra, 260 Conn. 362–63; see *State* v. *Lytell*, supra, 206 Conn. 657 (no violation of double jeopardy for two convictions of, sentences for, robbery in first degree where defendant held up husband, wife at gunpoint while taking property from each); *State* v. *Ingram*, supra, 43 Conn. App. 801 (no violation of double jeopardy for three convictions of, sentences for, robbery where defendant held up three bank tellers at gunpoint, took money from each).

Therefore, here, where the defendant used force to prevent Norman Lezotte from resisting the taking of the Lezottes' money and telephone,[23] and used force

---

[23] Although the statutory language does not seem specifically to require that there be a dual larceny for two robberies, Norman Lezotte and Patricia Lezotte both had an "ownership" interest in the telephone and the tax return money. Under the larceny statute, ownership merely requires a greater right to possession than that of the taker. Norman Lezotte and Patricia Lezotte both clearly had a greater right of possession to the money and telephone than did the defendant. See General Statutes § 53a-118 (a) (5).

to compel Patricia Lezotte to give the money and the telephone, the legislative intent was that both were victims of different crimes, and the defendant should be punished accordingly.

The offenses in this case were not the same offense for double jeopardy purposes and, therefore, the defendant's claim fails.

## IV

### JURY INSTRUCTIONS ON INTENT

The defendant claims that the instructions of the court were improper because the jury was allowed to consider, in determining guilt as to all of the crimes with which the defendant was charged, both types of statutory intent as defined in General Statutes § 53a-3 (11).[24] The defendant argues that it is reasonably possible that the jury was misled by the instruction and relies on *State* v. *DeBarros*, 58 Conn. App. 673, 678–84, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000), in seeking a new trial as to all of the charges against him. The defendant's argument requires an analysis of § 53a-3 (11) and the statutory elements of the crimes with which he was charged, as well as the *DeBarros* case.

Section 53a-3 (11) provides that "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." The definition embraces both the specific intent to cause a result and the general intent to engage in conduct described by a statute defining an offense.

---

[24] The claim was unpreserved because no request to charge on intent was filed by the defendant and no objection to the charge was made. It is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40, because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Hinton*, 227 Conn. 301, 308–309, 630 A.2d 593 (1993).

The defendant insists that the court's instructions allowed the jury to find him guilty of all the crimes without finding that he intended to cause the specific result prohibited by the statute, but solely finding instead that he intended to engage in conduct that caused that result. His argument is that because the court's instruction allowed the jury to find either that he had intended to engage in conduct or intended to cause a specific result, the jurors were misled. He relies on *DeBarros* for the proposition that an instruction that contains the entire definition of intent as provided in § 53a-3 (11) in cases involving specific intent crimes is improper. He then completes his argument by concluding that the instructions misled the jury and that a new trial is required. The state argues that the improper instruction in *DeBarros* is unlike that in this case, and that even if the instruction were improper, the jury could not have been misled.

General Statutes § 53a-60 (a) (2), assault in the second degree, in relevant part requires a jury to find beyond a reasonable doubt that a defendant, with intent to cause physical injury to another, causes such injury by means of a dangerous instrument. Section 53a-101 (a) (2), burglary in the first degree requires in relevant part that a defendant, in the course of committing the offense of burglary, intentionally inflicts or attempts to inflict bodily harm on anyone. Section 53a-134 (a) (1), robbery in the first degree in relevant part requires that a defendant cause serious physical injury in the course of committing a robbery. Section 53a-133 defines robbery as follows: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver

up the property or to engage in other conduct which aids in the commission of the larceny."

In every specific intent crime, there must be an intent to cause the particular result prohibited by the criminal statute. See *State* v. *DeBarros*, supra, 58 Conn. App. 680–81. Subsumed in the intended result is the intent to engage in the conduct. In other words, as correctly pointed out by the defendant, a jury must find not only that the defendant intended to engage in the particular conduct, but intended the result, that is, the harm that ensued from the conduct. Robbery in the first degree, burglary in the first degree and assault in the second degree all have as an element, the intentional causing of a result, rather than just the intentional engaging in conduct that led to the prohibited result. In this case, for example, the conduct involved in the assault charge was the intentional kicking of the victim, and the result was the physical injury inflicted on the victim by means of a dangerous instrument, the "feet and footwear" of the defendant. The conduct involved in the burglary was entering a building with the intent to commit a crime (larceny), and the taking of property to permanently deprive another of possession (larceny) was the prohibited result. The conduct involved in the robbery was the use of physical force by means of a dangerous instrument, the kicking, and the prohibited result was the commission of the larceny.

*State* v. *DeBarros*, supra, 58 Conn. App. 673, involved the crimes of murder, attempt to commit murder and assault in the first degree with a firearm. This court held that a portion of § 53a-3 (11), namely, "[a] person acts 'intentionally' . . . when his conscious objective is . . . to engage in such conduct," was inapplicable to the facts of the case. Id., 681–82. The trial court referred to that inapplicable portion seven times in its instructions and, additionally, after a request by the jury for clarification of "intent," twice repeated the same

inapplicable portion. Id., 683. The defendant in *DeBarros* claimed that because the court read the entire definition, the jury was permitted to find him guilty of the specific intent crimes, namely, assault and murder, without necessarily finding that he had intended to cause the specific results of physical injury and death, respectively. Id., 679.

The court in *DeBarros* concluded that there was a constitutional violation and that the state had failed to show the harmlessness of the violation beyond a reasonable doubt. Id., 682–84. After reiterating the black letter law maxim that a jury charge is to be read as a whole, without focusing on individual instructions in artificial isolation, the court determined that it was reasonably possible that the jury was misled because the probable effect of the improper charge was that it guided the jury to an incorrect verdict. Id., 682–83. That conclusion rested, in large part, on the fact that the improper instructions were given to the jury at least nine times, counting the subsequent clarification of the instruction. Id., 683. The court also noted that the jury specifically asked for a clarification of the instruction on intent. The *DeBarros* jury did not have the court's written instructions in the jury room while deliberating, some portions of which rectified the improper instruction. In the present case, no inquiry was made by the jury as to intent, and the court's written instructions were given to the jury while it deliberated.

The court's written instructions, which the jury had, not only contained the entire definition of § 53a-3 (11), but related to the result of the defendant's conduct. As to the crime of burglary in the first degree, the court made it clear that to find the defendant guilty, the jury had to find that he intended to enter the building, the act, that he intended to commit a crime, larceny, and that he intended to deprive another of property, that he wrongfully took property of the victims, intending

to deprive them of ownership, and that he intentionally inflicted bodily harm on Norman Lezotte. The court instructed in relevant part: "In summary, then, if you find [that] the state has proved beyond a reasonable doubt that the defendant intentionally . . . inflicted bodily injury on Norman Lezotte, then the state has proved this element [§ 53a-101 (a) (2)] of the crime of burglary in the first degree. Thus, if you find beyond a reasonable doubt [that] the defendant, one, entered into the apartment unlawfully, and, two, that at the time he entered that apartment, his intent was to commit a crime, the crime of larceny, and, three, in the course of committing the offence, he intentionally . . . inflicted . . . bodily injury on Norman Lezotte, your verdict would be guilty . . . ."

In charging on the crime of assault of a victim sixty years of age or older in the second degree, the court stated that there must be an intent "to physically injure another person." It also charged that there must be "an intent to cause physical injury . . . and that the defendant must have caused such injury . . . by means of a dangerous instrument."

The court also charged on intent in connection with the crime of robbery in the first degree. The court instructed: "You must find that the state has proven beyond a reasonable doubt . . . that the defendant in the course of committing a larceny . . . used physical force upon another . . . for the purpose of preventing or overcoming resistance to the taking of the property." The court in discussing larceny, elements of which are included in both robbery and burglary in this case, reiterated that the defendant must wrongfully take property with the intention of depriving its possessor or owner of possession.

We conclude that the jury was not misled and that the entire instruction in this case is more closely akin

to those instructions given in *State* v. *Francis*, 246 Conn. 339, 358–59, 717 A.2d 696 (1998), *State* v. *Austin*, 244 Conn. 226, 232, 710 A.2d 732 (1998), and *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995). In those cases, by giving other proper instructions, the trial courts lessened the risk of jury confusion about the two types of statutory intent in the crimes with which the defendants in those cases were charged.

The instructions as a whole in those cases and in the present case make it clear that the state had to prove beyond a reasonable doubt that the defendant had the intent to cause the specific results involved in the crimes with which he was charged. See *State* v. *Jaynes*, 36 Conn. App. 417, 430, 650 A.2d 1261 (1994), cert. denied, 233 Conn. 908, 658 A.2d 980 (1995). The defendant is not entitled to a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.