## STATE OF CONNECTICUT *v.* DAVID BOYD
## (AC 18167)

Lavery, Schaller and Hennessy, Js.[1]

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued October 19, 1999—officially released April 4, 2000

*Melvin A. Simon,* special public defender, for the appellant (defendant).

*Toni M. Smith-Rosario,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Warren Maxwell,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, David Boyd, appeals from the judgments of conviction rendered following his conditional pleas of nolo contendere on consolidated informations to two counts of robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53-202k, one count of assault in the second degree in violation of General Statutes § 53a-60 (2), two counts of illegal possession of a pistol or revolver in violation of General Statutes § 53a-217c, and one count of theft of

a firearm in violation of General Statutes § 53a-212.[2] The defendant claims that (1) he was unlawfully compelled by police coercion and duress to waive his fourth amendment right to be free from unreasonable searches and seizures, and (2) the trial court improperly denied the defendant's motion to suppress. We affirm the judgments of the trial court.

The following facts are relevant to the determination of this appeal. On May 1, 1995, shortly after 9 a.m., the Hartford police learned that a robbery had been committed in a bank parking lot in Hartford. The victim described the assailant as a black male with a large build, wearing a dark coat with a bandanna around his face and brandishing a handgun. At the time of the robbery, the defendant was a suspect in six prior, unresolved robberies of a similar pattern, leading the police to conclude that the defendant might be a suspect in the current robbery.

Robert Garten, a detective with the crimes against persons division of the Hartford police department, learned of the robbery and contacted the defendant's parole officer, Gary Hyman. Garten told Hyman to contact the defendant. Hyman called the defendant to remind him of a future appointment, and called Garten back. Hyman told Garten that the defendant sounded uncharacteristically winded, out of breath and upset.

Soon after, Thomas Grodecki, an officer with the Hartford police department, arrived at the defendant's apartment building with three other officers. On Garten's request, Hyman telephoned the defendant again to inform him that police had surrounded his apartment, that they intended to question him regarding the robbery and that he should cooperate. Grodecki was aware

---

[2] The defendant was charged by information in two separate criminal cases with six charges related to two armed robberies. The cases were consolidated upon motion of the state.

that the defendant had a prior criminal history. Grodecki approached the apartment door with his gun drawn while another officer remained at the base of the stairwell, also with his gun drawn.

The defendant opened his apartment door without prompting. Grodecki, with his gun still drawn, explained why he was there and stated, "I'm not going to hurt you. I don't want you to hurt me. I'm a grandfather. I'm about to retire." The defendant then invited Grodecki into his apartment, and Grodecki patted him for weapons. Grodecki observed that the defendant was extremely polite and cooperative. Grodecki was given permission by the defendant for officers to look around the apartment for other people. While walking through the apartment, Grodecki observed a blue and black bandanna scarf that was placed on a radiator. After Grodecki completed his tour, the defendant agreed to let other officers into his apartment.

The defendant agreed to accompany another officer to police headquarters, and Grodecki remained at the scene to secure the apartment. Grodecki went to use the bathroom and saw a small portion of a Fleet Bank deposit slip floating in the toilet. Grodecki notified detectives, and the slip was removed from the toilet so it would not be destroyed.

Officers obtained a search warrant for the defendant's apartment. The defendant's apartment, in which he resided with his then girlfriend, was on the second floor of a three-story apartment building. The defendant's apartment connected to a back porch with a railing in the rear of the apartment building. The defendant's back porch was further connected by a stairwell to similar porches above and below the defendant's apartment. A door on the ground floor, which was locked, provided access to the outside. A common staircase provides tenants access to all three floors. Each

tenant has items stored on the particular porch area on his or her floor.

While executing the search warrant, an officer entered the second floor back porch of the defendant's apartment and ascended the stairs to the third floor porch directly above the defendant's porch. On the third floor porch, the officer saw a bank bag hanging off one of the shelves. The bag contained $3000 and a revolver, the serial number of which matched that of a revolver stolen in a prior robbery.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

I

The defendant contends that he was unlawfully compelled by police coercion and duress to consent to the search of his apartment. He claims that the officers' encircling of the apartment building and approaching him with guns drawn created an impermissibly coercive environment vitiating the defendant's consent. We disagree.

"A warrantless search is not unreasonable under the fourth amendment to the United States constitution when a person with authority to do so has freely consented. *State* v. *Martinez*, 49 Conn. App. 738, 743, 718 A.2d 22, cert. denied, 247 Conn. 934, 719 A.2d 1168 (1998). The question of whether a defendant has given

voluntary consent to . . . search . . . is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the . . . search. *State* v. *Vargas*, 34 Conn. App. 492, 496, 642 A.2d 47, cert. denied, 230 Conn. 907, 644 A.2d 921 (1994). The voluntariness of the consent is normally decided by the trial court based on the evidence it deems credible along with the reasonable inferences that can be drawn therefrom. *State* v. *Ortiz*, 17 Conn. App. 102, 103–104, 550 A.2d 22, cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988)." (Internal quotation marks omitted.) *State* v. *Story*, 53 Conn. App. 733, 737–38, 732 A.2d 785, cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999). " 'Whether there was a valid consent to search is a factual question that will not be lightly overturned on appeal.' " *State* v. *DaEria*, 51 Conn. App. 149, 170, 721 A.2d 539 (1998).

The police did not exert an unduly coercive force over the defendant. Although the presence of drawn weapons is certainly a factor in determining voluntariness; *United States* v. *Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (stressing no weapons displayed in finding consent voluntary), cert. denied, 525 U.S. 1123, 119 S. Ct. 906, 142 L. Ed. 2d 904 (1999); *State* v. *Reason*, 263 Kan. 405, 415–16, 951 P.2d 538 (1997); it is not dispositive. The defendant was not greeted with a phalanx of weapons when he opened his apartment door for the police. Rather, one officer had his weapon drawn at the defendant's door while another with his weapon drawn remained at the bottom of the apartment stairs. See *United States* v. *Smith*, 973 F.2d 1374, 1376 (8th Cir. 1992).

Further, the manner in which the police encountered the defendant minimized the potentially coercive effect of their brandished weapons. Here, the armed officers did not rouse the defendant out of bed in the middle of the night; cf. *Harless* v. *Turner*, 456 F.2d 1337, 1338

(10th Cir. 1972); break down the door to the defendant's apartment in the early hours of the morning; cf. *United States* v. *Mapp*, 476 F.2d 67, 77–78 (2d Cir. 1973); or use threatening language. See *Ex parte Tucker*, 667 So. 2d 1339, 1344 (Ala.), cert. denied sub nom. *Alabama* v. *Tucker*, 516 U.S. 944, 116 S. Ct. 382, 133 L. Ed. 2d 305 (1995). Rather, the defendant's parole officer warned him in advance that officers were coming and suggested that the defendant cooperate. Furthermore, Grodecki's words when first encountering the defendant appear to show that Grodecki was more concerned with his own safety than with intimidating the defendant.

In addition, the defendant, through his words, acts and conduct, revealed that his consent to enter his apartment was given freely. See *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 609, 711 A.2d 688 (1998). The defendant opened his apartment door without the police having knocked first. The defendant was extremely polite and cooperative. The defendant was not taken by surprise— he knew why the police were there when the door opened, having spoken to his parole officer beforehand. After Grodecki began to explain the purpose of his presence, the defendant invited Grodecki inside the apartment. After Grodecki informed the defendant that he was a suspect in a robbery, Grodecki asked the defendant if he could look around the apartment for weapons, other people and contraband. The defendant responded, "I've got some problems. I don't want to have any more problems. You can do whatever you want." Detective Garten also noted the permission given to him by the defendant to walk through the apartment and stated that the defendant told him that he had nothing to hide. These facts reveal that throughout the time police were present, the defendant provided consent on repeated occasions and showed no signs of being placed under police coercion or duress.[3]

---

[3] The defendant also argues that the conduct of the police in concert with the parole officer created a coercive environment that was overbearing on

Furthermore, the defendant was not a neophyte in dealing with the criminal justice system. See *United States* v. *Webster*, 162 F.3d 308, 333 (5th Cir. 1998) (court stressed defendant's experience in police procedure), cert. denied, 528 U.S. 829, 120 S. Ct. 83, 145 L. Ed. 2d 70 (1999); *United States* v. *Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996), cert. denied, 520 U.S. 1222, 117 S. Ct. 1720, 137 L. Ed. 2d 842 (1997). The defendant, who had previous experience with police criminal procedure and penal institutions, aided the police, cooperated with them, accompanied them into his apartment and treated them as his guests. See *State* v. *Hanna*, 150 Conn. 457, 472, 191 A.2d 124 (1963). He displayed the self-assurance of a man confident that such a course would dispel their suspicions and thereby best serve his interests.

As the court noted in its oral decision, "[t]he defendant's consent was freely and voluntarily given . . . there's no credible evidence that threats were made, or that cooperation was coerced, or that the defendant's will was overborne by anyone or any conduct, particularly given his prior history and experience with the system." We agree. The aforementioned facts, considered separately or cumulatively, do not rise to the level of unlawful police coercion impeding the defendant's ability to refuse to consent to a search of the apartment.

II

The defendant also argues that the trial court failed to suppress evidence seized without a warrant arising from police entry into the third floor porch because he had a reasonable expectation of privacy in the evidence

---

the defendant. The authority cited by the defendant, *United States* v. *Hallman*, 365 F.2d 289, 292 (3d Cir. 1966), is distinguishable. In short, *Hallman* involved the police taking the defendant into custody at the request of his parole officer. Id., 290. Here, the parole officer did no more than call the defendant and tell him to cooperate with the police. No coercive instructions were given. The defendant's contention thus holds no merit.

seized. We disagree with the defendant, conclude that he possessed neither a subjective expectation of privacy nor an expectation of privacy that society would objectively find reasonable, and explain our reasoning below.

"The touchstone to determining whether a person has standing to contest an allegedly illegal search is whether that person has a reasonable expectation of privacy in the invaded place. *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State* v. *Joyce*, 229 Conn. 10, 20, 639 A.2d 1007 (1994). Absent such an expectation, the subsequent police action has no constitutional ramifications. *State* v. *Mooney*, 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); *State* v. *Brown*, 198 Conn. 348, 355, 503 A.2d 566 (1986). In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances. . . . *State* v. *Joyce*, supra, 20. Furthermore, [t]he defendant bears the burden of establishing the facts necessary to demonstrate a basis for standing; *State* v. *Callari*, 194 Conn. 18, 23, 478 A.2d 592 (1984), cert. denied, 469 U.S. 1210, 105 S. Ct. 1178, 84 L. Ed. 2d 327 (1985); and the trial court's finding [on the question of standing] will not be overturned unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law. *State* v. *Pittman*, 209 Conn. 596, 601, 553 A.2d 155 (1989)." (Internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 92–93, 675 A.2d 866 (1996).

## A

The subjective prong of the reasonable expectation test has not received much attention regarding its individual significance and precise interpretation. 1 W. LaFave, Search and Seizure (3d Ed. 1996) § 2.1 (c), p. 388. The subjective test does not rest on the absolute subjective perception of the individual defendant. *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring); *United States* v. *Taborda*, 635 F.2d 131, 137 (2d Cir. 1980) (purely subjective criterion is not appropriate and is not called for by *Katz*); *State* v. *Mooney*, supra, 218 Conn. 94 (subjective inquiry focuses on "whether the individual has exhibited an actual subjective expectation of privacy"). For example, such an interpretation could, in extreme cases, permit the government to strip away subjective expectations of privacy merely by providing repeated warnings of a search or seizure. See *Smith* v. *Maryland*, 442 U.S. 735, 740 n.5, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); *United States* v. *Kim*, 415 F. Sup. 1252, 1256–57 (D. Haw. 1976); 1 W. LaFave, supra, § 2.1 (c), pp. 387–89.

Rather, a subjective expectation of privacy rests on finding conduct that has demonstrated an intention to keep activities or things private and free from knowing exposure to others' view. *United States* v. *Taborda*, supra, 635 F.2d 137; see also *State* v. *Mooney*, supra, 218 Conn. 95. Accordingly, to meet this burden, a defendant must show facts sufficient to create the impression that (1) his relationship with the location was personal in nature, (2) his relationship with the location was more than sporadic, irregular or inconsequential, and (3) he maintained the location and the items within it in a private manner at the time of the search. *United States* v. *Gerena*, 662 F. Sup. 1218, 1235 (D. Conn. 1987); *State* v. *Mooney*, supra, 96–97 (citing similar considerations).

The defendant has not adduced facts sufficient to show any of those three factors. First, the defendant has not shown that his relationship with the location was a personal one. Only Robin Ruff, the defendant's then girlfriend, was given permission to access the third floor porch area by the third floor tenants. Ruff's permission was limited to using a clothes dryer located there. For the most part, Ruff dried her clothes and then removed them from the third floor area when she was finished.[4] The defendant provided no evidence that *the defendant himself* received any kind of permission to use the porch for any reason. Fourth amendment rights are personal rights that cannot be vicariously asserted. *State* v. *Morrill*, 197 Conn. 507, 540, 498 A.2d 76 (1985). At most, the defendant articulated a collective interest in the area, derived from Ruff's requests for permission to use the laundry dryer, from the third floor tenants. See *United States* v. *Vicknair*, 610 F.2d 372, 379–81 (5th Cir.) (interest must be personal in nature and not merely part of collective interest), cert. denied, 449 U.S. 823, 101 S. Ct. 83, 66 L. Ed. 2d 25 (1980). Such a derivative interest cannot sustain fourth amendment protection.

Second, any interest exhibited, if any such interest existed at all, by either the defendant or Ruff in the third floor porch was sporadic, irregular and inconsequential. The interest was sporadic in that it only possibly existed

[4] Only after additional prompting by defense counsel did Ruff even claim that any articles were left in the third floor area at all after drying was complete. The trial transcript states:

"[Defense Counsel]: And what arrangements did you have with [one of the third floor tenants] concerning [the third floor porch] area?

"Robin Ruff: I asked her, 'Can I use the facility [from] one time to another?' She said, 'Sure, that was okay.' But I was comfortable enough to use it more than once.

"Q. And did you ever leave any clothes up there?

"A. Not really. For the most part, I would dry them, you know, get my items.

"Q. But occasionally you might have?

"A. Possibly, yeah."

when Ruff was granted permission each time she wanted to use the clothes dryer. Ruff did not receive general permission to use the clothes dryer, but asked for permission each time use was needed. The interest was irregular as it did not exist at all during nonwinter months when Ruff chose to dry her clothes on a clothesline. This is particularly significant in light of the fact that the search occurred on May 1, a spring day. The interest was inconsequential as it related to the use of a dryer and no other part of the porch area. See *United States* v. *Garcia*, 741 F.2d 363, 366 (11th Cir. 1984) (to sustain reasonable expectation of privacy, defendant's privacy interest must be significant). Any possible interest that could arise from the defendant's, or even Ruff's, activities regarding the third floor porch is negligible, if any interest existed at all.

Third, the defendant did not maintain the location and the items within it in a private manner at the time of the search. The bag was located on a shelf, in view of anyone present on the porch, including the officer who discovered the item. The defendant held no ownership interest in the third floor porch area. In sum, the defendant has not shown any evidence that manifests a subjective expectation of privacy in the third floor porch.

B

The second prong of the reasonable expectation of privacy focuses on an objective perspective. As noted previously, a reasonable expectation of privacy under this prong stems from a place where "society is prepared, because of its code and values and its notions of custom and civility, to give deference to a manifested expectation of privacy." (Internal quotation marks omitted.) *State* v. *Hill*, supra, 237 Conn. 94. "The determination of what Connecticut citizens would consider reasonable in the present day . . . is made on a case-

by-case basis . . . [and] involves a fact-specific inquiry into all the relevant circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Bernier*, 246 Conn. 63, 72, 717 A.2d 652 (1998).

Courts have used various factors to consider whether an objective expectation of privacy exists. "Such factors include 1) ownership of or other conventional property interests in the premises or its contents; 2) use of the location as a residence; 3) use of the premises on a regular basis for professional, religious, or business purposes; 4) presence at the time of the search, or at other times; 5) security measures undertaken by the defendant to ensure the privacy of the particular area searched; 6) a defendant's authority over the premises; 7) a defendant's ability or right to exclude others from the area; 8) use of the particular location as a repository for the defendant's personal belongings; 9) a defendant's subjective expectation that the premises would remain free from Government intrusion; and 10) whether any of the defendant's interests or efforts taken to ensure privacy were in existence or were undertaken at the time of the search or seizure." *United States* v. *Gerena,* supra, 662 F. Sup. 1253; see also *State* v. *Mooney,* 218 Conn. 95–97. Factors such as these "are, of course, relevant as helpful guides, but should not be undertaken mechanistically. They are not ends in themselves; they merely aid in evaluating the ultimate question in all fourth amendment cases—whether the defendant had a legitimate expectation of privacy, in the eyes of our society, in the area searched." (Internal quotation marks omitted.) *State* v. *Mooney,* supra, 97.

Although these factors are not exhaustive, and not every factor is relevant to every consideration, examining these as a whole reveals that the defendant did not have a manifested expectation of privacy in the third floor porch that society would find reasonable. The defendant lacked any property interest in the third floor

porch. He did not have permission to use the third floor porch as a storage area. The defendant placed the item in an easily viewable place that could be accessed by other tenants in the building and their guests. *State* v. *Brown*, supra, 198 Conn. 357 (expectations of privacy diminished in multiunit buildings because of areas used in common with other tenants); *State* v. *DeFusco*, 27 Conn. App. 248, 259, 606 A.2d 1 (1992) (privacy expectations vary according to location), aff'd, 224 Conn. 627, 620 A.2d 746 (1993); see also *United States* v. *Holland*, 755 F.2d 253, 255 (2d Cir.) ("established law of this Circuit that the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors"), cert. denied, 471 U.S. 1125, 105 S. Ct. 2657, 86 L. Ed. 2d 274 (1985). No quantified amount of traffic need be shown through the area to conclude that such an area is outside a protected zone of privacy. Id. Furthermore, the defendant could not exclude others from the area as it was not under his exclusive control. See id., 255–56. The defendant had no objective expectation of privacy in the third floor porch where the bank bag was found.

Accordingly, we conclude that the defendant lacks standing to challenge the warrantless entry of police into the third floor porch area. The trial court, therefore, properly denied the defendant's motion to suppress.

The judgments are affirmed.

In this opinion the other judges concurred.