STATE OF CONNECTICUT *v.* PATRICK D. SMITH
(AC 28188)

Bishop, McLachlan and Pellegrino, Js.

Argued September 5, 2007—officially released January 15, 2008

*Auden Grogins*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, special deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Patrick D. Smith, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3) and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B). After further findings by the jury on a second part of the criminal information and a subsequent hearing by the court, the trial court enhanced the defendant's sentence for being a persistent dangerous felony offender in violation of General Statutes § 53a-40. On appeal, the defendant claims that (1) the court

improperly denied his motion to suppress evidence seized as the result of an illegal warrantless search, (2) the one-on-one identification procedure used by the police violated his due process rights, (3) the court improperly permitted the state to introduce a witness' prior inconsistent written statement as substantive evidence and (4) the imposition of the enhanced sentence for being a persistent dangerous felony offender was contrary to our Supreme Court's recent holding in *State v. Bell*, 283 Conn. 748, 931 A.2d 198 (2007).[1] We reverse the judgment of conviction only as to the sentence imposed and affirm the judgment of the trial court in all other respects.

The jury reasonably could have found the following facts. Sometime around midnight on January 29, 2002, Andrew Cormier, a sergeant with the United States Army working as a recruiter in the Waterbury area, stopped to refuel his government van at a gasoline station in Waterbury. With him was his girlfriend, Catherine O'Brien, who went into the station's convenience store to purchase sodas. Cormier had finished filling the gasoline tank and was in the driver's seat when O'Brien returned to the vehicle. After she entered the passenger side of the van, but before she closed the door, the defendant appeared at the door and grabbed her with his right arm. He held a knife to her throat. Cormier briefly struggled with the defendant in an attempt to force the knife away from O'Brien, but the defendant had more leverage and Cormier ceased his resistance.

The defendant indicated that he needed a ride and assumed the front passenger seat, allowing O'Brien to move to the back bench seat behind Cormier. From the

---

[1] *Bell* was decided after the parties' appellate briefs had been filed but before oral argument. At oral argument, we invited the parties to file supplemental briefs addressing this issue.

time the defendant entered the van, he never relinquished either of the two knives that he brandished throughout the ordeal. Most of the time, he pointed one at or held it against O'Brien. At some point, the defendant began making demands for money. Cormier had no money in his wallet, but the defendant took his automated teller machine (ATM) card and driver's license. O'Brien indicated that she had left her wallet and checkbook in her own vehicle parked at Cormier's office. They then proceeded to Cormier's office and drove into the parking lot. The defendant instructed Cormier to retrieve O'Brien's belongings from her vehicle and warned Cormier that he would hurt O'Brien if he tried "anything funny." O'Brien had no money in her wallet, but the defendant took her checkbook, credit card and driver's license.

The defendant became agitated. He told Cormier that he needed $300 to pay his drug dealer and that Cormier had better get the money for him. Cormier said that he could telephone his supervisor, Donald Jernigan, but that Jernigan certainly would become suspicious at a request for such a large sum of cash at that early hour in the morning. The defendant directed him to ask for $100. Cormier called Jernigan on O'Brien's cellular telephone and made that request, with the defendant listening to the conversation while holding the knife to Cormier's throat. Jernigan stated that he had only $60, and the defendant nodded his head in agreement. Cormier drove them to Jernigan's apartment and, after parking the van, exited the vehicle at the defendant's direction and proceeded to retrieve the money. The defendant again threatened O'Brien and held one of the knives to her wrists until Cormier returned to the van.

After putting the $60 in his pocket, the defendant directed Cormier to drive to the north end of Waterbury. At the intersection of Johnson and Sperry Streets, the defendant exited the van. Before he left, he also took

O'Brien's cellular telephone. The entire incident, from the time the defendant entered the van until he exited and walked away, lasted approximately one hour and fifteen minutes to one hour and thirty minutes.

Cormier and O'Brien remained at the intersection for a few minutes to collect themselves and then drove to the Waterbury police station. At the station, they gave a physical description of the perpetrator. Cormier indicated that he had been wearing a black, knit hat with an emblem on it, a scarf around the face, a dark jacket, a red T-shirt and gloves. According to Cormier, the perpetrator was a middle-aged man in his forties or fifties, had white hair and very blue eyes. Although the hat was pulled down over the perpetrator's forehead, Cormier could see hair sticking out from beneath the hat and also noticed his large, unkempt eyebrows. O'Brien concurred with Cormier's description.

A radio dispatch relayed the information provided by Cormier and O'Brien, and shortly thereafter a patrolman noticed the defendant walking in the vicinity of Willow and Johnson Streets. Approximately forty-five minutes to an hour after the defendant had exited the van, Cormier and O'Brien were driven to the intersection where the defendant had been detained by the patrolman. From the backseat of the police vehicle, Cormier and O'Brien viewed the defendant, who then was standing in the road in the presence of several police officers. After Cormier and O'Brien identified the defendant as the perpetrator, he was arrested and taken to the police station.

At the time the defendant was detained, he indicated that he lived in an apartment at 80 Willow Street. After the defendant was arrested, Waterbury police officers went to the address he provided. When they arrived, Sergeant Timothy Wright knocked on the door to the apartment. Mark Casella, disheveled but dressed in

street clothes, answered the door and indicated that the defendant lived at that apartment. Casella stated that he had been staying there, as a guest, for approximately three to four weeks. He allowed the officers into the apartment, where they saw two knives on top of the coffee table in the main room or living room. Wright then radioed another officer and asked her to dial the number of the cellular telephone taken from O'Brien. The officer did so, and the sound of a ringing phone was heard in the defendant's apartment, coming from the area of a mattress lying on the floor in the living room. Casella indicated that he had been sleeping on that mattress when the defendant, who had been out for the evening, returned to the apartment at approximately 1 a.m. and put something under the mattress. Wright then turned over the investigation to the detective unit in order that an application for a search warrant could be prepared.

Lucinda Lopes, a crime laboratory supervisor employed by the Waterbury police department, assisted in the execution of the search warrant at the defendant's apartment. In addition to the cellular telephone and the two knives located in the apartment, Lopes seized a black coat, black scarf and black gloves identified at trial as having been worn by the perpetrator. From a wastebasket located in the living room, Lopes seized a checkbook, driver's license and credit card belonging to O'Brien and a driver's license and an ATM card belonging to Cormier.

The jury returned its verdict on May 11, 2004, finding the defendant guilty of the crimes of robbery in the first degree and kidnapping in the first degree. At that point, additional evidence was presented to the jury on the second part of the information, charging the defendant with being a persistent dangerous felony offender in violation of § 53a-40. On May 12, 2004, the jury returned its verdict finding the defendant guilty

of that charge. The court accepted the verdicts and rendered judgment accordingly. This appeal followed.

I

The defendant first claims that the court improperly denied his motion to suppress the evidence seized pursuant to the search warrant. Specifically, the defendant argues that the issuance of that warrant was based on information gathered by the police by virtue of their illegal warrantless entry and search of his apartment that was made after his arrest and without his consent.[2] The defendant claims that (1) the Waterbury police did not obtain consent to enter or to search his apartment, (2) Casella did not have the authority to consent to the entry or search of the apartment, (3) if Casella had the authority to consent, that consent was not given voluntarily and (4) any items seized pursuant to the search warrant issued on the basis of an illegal entry and search of his apartment should have been suppressed as the "fruits of the poisonous tree."

The defendant filed his pretrial motion to suppress on March 30, 2004. After hearing testimony over the course of three days and oral argument by counsel, and after reviewing the briefs submitted by the parties, the court issued an oral decision on April 30, 2004, granting in part and denying in part the motion.[3] That decision

[2] The defendant claims that the warrantless entry and search of his apartment was in violation of his state and federal constitutional rights. Because he has not briefed a state claim separately, we consider only a claim of a federal constitutional violation. See State v. Mulero, 91 Conn. App. 509, 514 n.3, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792, cert. denied, 549 U.S. 862, 127 S. Ct. 149, 166 L. Ed. 2d 108 (2006).

[3] The only evidence excluded by the court was the cellular telephone. The court found that after it rang and the sound was determined to be coming from under the mattress, Wright asked Casella what was under the mattress, and Casella lifted the corner to display the telephone. The court considered Wright's request to Casella to be a search and seizure without a warrant.

was followed by a written memorandum of decision filed on July 22, 2004.

At the suppression hearing, Wright testified that in the early morning hours of January 29, 2002, he and another officer went to the address given by the defendant as his place of residence. The defendant already had been transported to the Waterbury police department. No one asked for the defendant's consent to enter or to search his apartment at that time.

Wright knocked on the door to the apartment several times, and, after a short delay, Casella opened the door. Casella's hair and clothing were disheveled, but he was dressed in street clothes. After Wright identified himself and the purpose for the visit, Casella invited him into the apartment with words to the effect of "[c]ome on in." After Wright entered the apartment, he asked Casella if the defendant lived in that apartment, and Casella stated that he did. Wright asked him if he also lived there, and Casella answered that he had been staying there for three or four weeks. Wright spoke with Casella for approximately twenty-five minutes inside the defendant's apartment, which was very small and had one main room. Casella indicated that the defendant had been out that evening, but had returned at around 1 a.m. and put something under a mattress.

While at the apartment, Wright had a conversation with the investigating officer over the police radio and was informed that a cellular telephone had been taken from one of the victims of the robbery. The investigating officer then dialed the number of that cellular telephone, and ringing was heard in the apartment coming from the direction of a mattress on the floor. Wright asked Casella what was under the mattress, and Casella lifted its corner and displayed the cellular telephone. While in the apartment, Wright also saw two knives on the table in the living room. Other law enforcement

personnel arrived at the apartment, and, sometime after that, Casella was taken to the Waterbury police station to give a statement.

Kenneth Borer, a patrolman with the Waterbury police department, also testified at the suppression hearing and indicated that he had been at the defendant's apartment with Wright. Borer recalled that Casella stated that he lived in the defendant's apartment. When he entered the apartment, Borer noticed two knives on a table in the living room. At one point, Casella specifically pointed out a wastebasket in that room and told Borer that the defendant had made several trips to it. Borer looked inside but saw nothing. Casella insisted that the defendant had gone into the wastebasket, prompting Borer to look once again. Borer then saw some items between the side of the plastic liner and the side of the wastebasket. It was from that wastebasket that Lopes, in executing the search warrant, retrieved O'Brien's checkbook, driver's license and credit card, and Cormier's ATM card and driver's license.

Casella also testified at the suppression hearing. His recollection of the events on January 29, 2002, differed greatly from that of the police officers. Casella indicated that he was awakened by an officer kicking the mattress on which he was sleeping. The police told him to get up, and Casella noticed that the door to the apartment had been forced open and that officers were going through the apartment. He testified that he heard no ringing cellular telephone and that he did not recall telling the police that the defendant put something under his mattress. One of the officers told him that his friend, the defendant, was not coming back and that Casella had to accompany them to the police station. Casella admitted that he gave a written statement at the station, which he signed, but stated that he did so because he was told that he could not leave the station

until he gave one. Casella also indicated that he had at least fifteen felony convictions and had been incarcerated for all but twenty months between 1985 and his testimony in 2004.

In rebuttal, Lopes testified that after she had completed the search of the defendant's apartment and returned to the station, she noticed that she had left an original page of a form that she needed at the apartment. She returned to the defendant's apartment. The door was locked, however, and she could not enter because she had no key. The landlord was contacted and unlocked the door. At that time, there was no damage to the door or to the locks on the door on the outside or on the inside of the defendant's apartment.

In its memorandum of decision, the court found that Casella consented to the entry of the police officers into the defendant's apartment, that Casella had authority to give that consent and that the consent was given voluntarily. The court further found that the officers were lawfully within the apartment and that the knives were in "plain view." The ringing of the cellular telephone was not suppressible because the officers were lawfully in a position to hear it, which the court compared to objects being within "plain view." The items in the wastebasket were discovered as the result of Casella's insistent actions, calling Borer's attention to the wastebasket and stating that the defendant made repeated trips to that wastebasket. The court found that Casella, by those actions, freely consented to Borer's inspection of the wastebasket. In making those findings, the court specifically stated that it found the testimony of the officers to be credible and that it did not find Casella's testimony credible because of his "inconsistent testimony, felony convictions and convoluted presentation of facts." Accordingly, except for the actual cellular telephone, which the court suppressed, the court denied the defendant's motion to suppress the

evidence seized from the defendant's apartment. We agree with the court's ruling.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Under the clearly erroneous standard, [w]e cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Ortiz*, 101 Conn. App. 411, 416–17, 922 A.2d 244, cert. denied, 283 Conn. 911, 928 A.2d 538 (2007).

The defendant claims that the first warrantless entry into and search of his apartment was illegal. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997), quoting *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "The Fourth Amendment [to the United States constitution] does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. . . . Searches and seizures inside a home without a warrant are presumptively unreasonable. . . . However, [i]t is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. . . . Therefore, a warrantless search or entry into a house is not unreasonable . . . under the fourth amendment to the United States constitution . . . when a person with authority to do so has freely consented." (Citations omitted; internal quotation marks

omitted.) *State* v. *McColl*, 74 Conn. App. 545, 559, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003). "The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 69, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

## A

We first address the defendant's claim that the Waterbury police did not obtain consent to enter or to search the defendant's apartment. It is undisputed that the defendant was not asked for his consent to enter or to search the apartment at 80 Willow Street at the time he was arrested or transported to the Waterbury police station. The court found, however, that Casella consented to the entry of the police when they appeared at the apartment door in the early morning hours of January 29, 2002.

The defendant argues that Casella's testimony established that the police were already inside the apartment when they awakened Casella by kicking the mattress on the floor. He further argues that even if Casella's testimony is not believed, the testimony of the officers established only that the police followed Casella into the apartment and that he did not protest their entry. "[C]onsent may not be established by mere acquiescence to police authority." (Internal quotation marks omitted.) *State* v. *Janulawicz*, 95 Conn. App. 569, 575, 897 A.2d 689 (2006).

The court specifically stated in its decision that it did not find Casella's testimony to be credible. It also stated that it did find credible the testimony of Wright and the other police officers. Wright testified at the suppression hearing that after he knocked on the apartment door and Casella answered, Wright identified himself and the

purpose for his presence. At that point, Wright indicated that Casella invited them in with words to the effect of "[c]ome on in." "[I]t is axiomatic that [w]here there is conflicting testimony, it is uniquely the function of the trier of facts to weigh the evidence and assess the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Janulawicz*, supra, 95 Conn. App. 576. It was within the province of the court, as the fact finder in the motion to suppress hearing, to find the officers' testimony more credible than that of Casella.

The record, therefore, supports the court's determination that Casella gave consent for the officers to enter the apartment, and that finding was not clearly erroneous.

B

The defendant next claims that Casella did not have the authority to consent to the entry into or the search of the defendant's apartment. In support of that claim, he argues that Casella was a temporary guest of the defendant and that he did not pay any rent. He further argues that Casella testified that he told the police that the apartment was the defendant's apartment and that he did not invite the officers into the apartment.

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. . . . Common authority is . . . not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so

that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. . . . In addition, a warrantless search is valid when it is based on the consent of a third party who the police, at the time of the search, reasonably believe possesses common authority over the premises but who in fact does not have such authority." (Citation omitted; internal quotation marks omitted.) *State* v. *Vazquez*, 87 Conn. App. 792, 803–804, 867 A.2d 15, cert. denied, 273 Conn. 934, 875 A.2d 544 (2005).

"[W]hether the individual providing consent possessed the requisite authority . . . is a question of fact to be determined from the totality of all the circumstances. . . . As a question of fact, it is normally to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence. . . . We may reverse [the trial court's factual] findings on appeal only if they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 275, 897 A.2d 554 (2006).

In reaching its determination that Casella had the authority to consent to the warrantless entry into the defendant's apartment, the court noted that the police informed Casella that they were investigating a robbery in which the defendant may have been involved, that Casella invited them into the apartment, that Casella indicated that he had been staying at that apartment for three to four weeks, that Casella informed them that several visitors had come and gone while he was staying there and that the apartment had one large, main living area in which Casella slept on a mattress located on the floor. From those facts, the court found that it was reasonable for the Waterbury police to infer that Casella had common authority over that apartment.

We conclude that the court's finding that Casella possessed the requisite authority to allow the police into the defendant's apartment was not clearly erroneous.

## C

The defendant next claims that if Casella gave consent to enter the apartment, that consent was not given freely and voluntarily. Specifically, the defendant argues that the state did not prove and the record did not establish that Casella gave his voluntary consent to enter or to search the apartment.

In support of his claim, the defendant references testimony that the officers followed Casella into the apartment, testimony of Casella that he had consumed alcohol and drugs that evening, testimony of Casella that he never gave the officers his consent to enter or to search the apartment and testimony of Casella that the officers forced their way into the apartment. Again, the defendant challenges the factual findings of the court. The court specifically found that Casella was not credible. The court found credible Wright's testimony that Casella invited them into the defendant's apartment. Borer, one of the officers with Wright, testified at the suppression hearing that Casella was open, talkative and very willing to tell Wright everything he knew. We will not retry the facts or pass on the credibility of witnesses.

## D

The defendant's final argument with respect to his claim that the court improperly denied his motion to suppress is that the search warrant, pursuant to which evidence from his apartment was seized, was based on the initial illegal warrantless entry and search. Any items seized pursuant to that warrant, he claims, must therefore be suppressed as the fruit of prior police

illegality. This argument is cumulative of his previous claims and fails for the reasons already discussed.

Casella gave the officers his voluntary consent to enter the defendant's apartment. He had the requisite authority to do so. When the officers were inside the living room, they saw clothing and two knives in "plain view." "[T]he police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search warrant *or are otherwise entitled to be in a position to view the items seized.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Thomas,* 98 Conn. App. 542, 552, 909 A.2d 969 (2006), cert. denied, 281 Conn. 910, 916 A.2d 53 (2007). They also were lawfully in a location in which they could hear the ringing of O'Brien's cellular telephone.

With respect to the items in the wastebasket, Casella directed the attention of one of the officers to that wastebasket. As the court found, Casella's insistent actions in pointing out the wastebasket and his statement that the defendant made several trips to it, amounted to conduct that indicated his consent was freely given. Casella, "through words, acts and conduct revealed that his consent was freely given." *State* v. *McColl,* supra, 74 Conn. App. 560. Furthermore, as noted by the court, Casella was not a neophyte in dealing with the criminal justice system. He had extensive experience with the police and, here, aided and cooperated with them. See *State* v. *Boyd,* 57 Conn. App. 176, 183, 749 A.2d 637, cert. denied, 253 Conn. 912, 754 A.2d 162 (2000).

For all of those reasons, the court's findings that Casella voluntarily consented to the entry of the defendant's apartment and the search of the wastebasket were not clearly erroneous. Accordingly, the evidence seized pursuant to the search warrant, issued as the

result of the officers' observations during their warrantless entry and search of the wastebasket, was not the "fruit of the poisonous tree." See *Wong Sun* v. *United States,* supra, 371 U.S. 485.

## II

The defendant next claims that the one-on-one procedure used by the Waterbury police to obtain his identification by Cormier and O'Brien violated his right to due process under the federal and state constitutions.[4] Specifically, the defendant argues that the identification procedure was unnecessarily suggestive and that the resulting identification was unreliable.

The defendant concedes that his claim was not preserved properly at trial. He did not challenge the out-of-court and subsequent in-court identifications at trial. He now seeks review under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding,* "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40.

We will review the defendant's claim because he has satisfied the first two prongs of *Golding.* The record

---

[4] Because the defendant has not briefed a state claim separately, we consider only a claim of a federal constitutional violation. See *State* v. *Mulero,* 91 Conn. App. 509, 514 n.3, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792, cert. denied, 549 U.S. 862, 127 S. Ct. 149, 166 L. Ed. 2d 108 (2006).

in this case, although scant due to the fact that no suppression hearing was held on the pretrial identification, is adequate for us to review. The alleged violation is of constitutional magnitude. "[A] claim that an unnecessarily suggestive pretrial identification procedure tainted a subsequent identification made at trial is one of constitutional magnitude." *State* v. *Tatum*, 219 Conn. 721, 726, 595 A.2d 322 (1991). The defendant nevertheless cannot prevail on his claim because he has failed to satisfy the third prong of *Golding*.

"In determining whether identification procedures violate a defendant's due process rights, [t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 246, 710 A.2d 732 (1998). "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, we must weigh the corrupting effect of the suggestive procedure in light of certain factors such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [that person's] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." (Citation omitted; internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 687–88, 631 A.2d 271 (1993).

"[G]enerally a one-to-one confrontation between a victim and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the victim that the police

believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Tatum*, supra, 219 Conn. 727. "An in court identification must be excluded, as violative of due process, only if it is the product of an unconstitutional pretrial identification procedure." Id., 726–27. Here, the defendant claims that the one-on-one pretrial identification procedure was unconstitutional and tainted the subsequent in-court identification of him by Cormier and O'Brien. We disagree.

A review of the record indicates that the defendant was detained at the intersection of Willow and Johnson Streets. Cormier and O'Brien, who still were at the police station at the time of his detention, were told that a person matching the description of the perpetrator had been found, and they were asked to accompany two officers in a police sport-utility vehicle to make an identification. Sitting in the backseat of the vehicle, which had tinted windows, they were transported to that location. The vehicle in which they were seated then parked in a direction facing opposite two other parked police cruisers. The defendant was led from one of the cruisers and stood in the road in front of the two cruisers, with several police officers standing around him. The defendant was approximately twenty-five to thirty feet away from Cormier and O'Brien. Very bright lights on top of the sport-utility vehicle, known as take down lights, were directed at the defendant and illuminated him. Cormier and O'Brien could see the defendant clearly, and they both positively identified him as the person who had kidnapped and robbed them that evening.

Even if the one-on-one pretrial identification procedure used by the police was unnecessarily suggestive,[5]

---

[5] Without more in the record to support the defendant's argument, we cannot come to a definite conclusion that the identification procedure was unnecessarily suggestive under the circumstances of this case. The state argues that the detaining officers acted diligently to pursue a means of investigation that was likely to confirm or to dispel their suspicions quickly.

we conclude that the identification in this case was nonetheless reliable under the totality of the circumstances. See *State* v. *Wooten*, supra, 227 Conn. 687–88. Cormier and O'Brien were in the presence of the perpetrator for more than one hour. During that time, he was very close to them, holding a knife to their throats or wrists while inside the government van. Cormier testified that in the course of his military training, he had been instructed in identification techniques during stressful situations. Further, the description of the perpetrator given by Cormier and O'Brien to the police prior to the challenged identification procedure was detailed and accurate. The description of the perpetrator's age, build, eye and hair color and the clothes that he had been wearing matched that of the defendant. Cormier and O'Brien displayed no degree of uncertainty when they identified the defendant at the one-on-one confrontation. Finally, less than two hours had passed from the time the incident ended, with the defendant exiting the government van, until Cormier and O'Brien positively identified the defendant as the perpetrator at the show-up identification.

After our review of the record, we conclude that the identification was reliable under the totality of the circumstances, and, thus, the defendant's due process rights were not violated. Because the defendant was not deprived of a fair trial, the third prong of *Golding* has not been satisfied.

An immediate viewing enabled the police to focus their investigation and gave them greater assurance that innocent parties would not be unjustly detained. The incident had happened recently, and the memories of Cormier and O'Brien would be fresh. Further, the defendant had not been arrested, and it was after 1 a.m. when he had been detained. Alternative identification procedures, such as a lineup with similar looking males, may have been impractical. For those reasons, exigent circumstances may have existed that precluded the one-on-one identification procedure from being unnecessarily suggestive. See *State* v. *Ledbetter*, 275 Conn. 534, 549, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

## III

The defendant also claims that the court improperly permitted the state to introduce Casella's signed, prior inconsistent written statement as substantive evidence at trial pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Specifically, the defendant argues that Casella's statement should not have been admitted because it was unreliable and untrustworthy. He claims that Casella was intoxicated at the time he gave the statement, that he felt pressured by the police to give the statement and that he believed that he could not leave the police station until he had given a statement.

The *Whelan* rule allows the substantive use of a prior inconsistent written statement if it is signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. Id., 753. While testifying at trial, Casella made several statements that were inconsistent with the written statement he had given police shortly after the incident. He admitted that he had given a written statement and verified his signature on that statement. The state began to question Casella about the inconsistencies in the statement. The defendant objected and asked that the jury be excused.

With the jury excused, the state indicated that it was offering Casella's written statement for substantive purposes. The court stated that although the statement satisfied the requirements of *Whelan*, it had to make an additional finding as to the reliability of the statement before it could be admitted for substantive purposes. The court then conducted a hearing, outside of the jury's presence, to allow testimony on that issue.

At that hearing, Eugene Coyle, a sergeant employed by the Waterbury police department in the detective division, testified that he spoke with Casella about the

robbery on January 29, 2002, at approximately 7 a.m. or 8 a.m., and took his statement. He was the only detective to speak with Casella at that time. He testified that he would ask Casella a question and then type Casella's response on his computer at a desk. Casella was seated next to Coyle and could see the monitor with his responses as they were being typed. After Casella had given his entire statement, Coyle printed the statement and asked Casella to review it again. He did and made no changes to the statement.

Coyle testified that he was with Casella for approximately thirty minutes. Coyle stated that Casella appeared to be tired, but did not have difficulty staying awake, and that he was cooperative and understood the questions being asked. Coyle did not notice the odor of alcohol on Casella's breath and stated that he appeared to be sober when he was giving the statement.

The only other witness to testify at the hearing addressing the reliability of the statement was Casella. He testified that the police told him that he could not leave the station until he signed a statement. He indicated that some of the information in the statement was accurate and that some of the information was false. Casella testified that he was "basically telling the man what he wanted to hear" and signed the statement so that he could leave.

The court found that the circumstances under which Casella's statement was made did not render it unreliable and permitted the state to introduce a redacted version of Casella's signed, prior inconsistent written statement as substantive evidence. The defendant challenges the court's ruling, citing *State* v. *Mukhtaar*, 253 Conn. 280, 750 A.2d 1059 (2000). In *Mukhtaar*, our Supreme Court noted that "a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive

or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes." Id., 306.

A statement that satisfies the *Whelan* requirements is, however, presumptively admissible. Id. The *Mukhtaar* court would not exclude such a statement unless a strong showing is made as to its unreliability. The court emphasized, however, that "the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill. Thus, because the requirements . . . established in *Whelan* provide a significant assurance of reliability, it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." Id., 306–307.

In this case, the court followed the procedure established in *Mukhtaar* and fulfilled its gatekeeping responsibility to ensure the reliability of Casella's statement. Having done so, the court allowed the state to introduce the statement into evidence for substantive purposes. "The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 289, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006). On the basis

of our review of the record, including the transcript of the testimony at the *Mukhtaar* hearing, we conclude that the court did not abuse its discretion in admitting Casella's signed, prior inconsistent written statement into evidence for substantive purposes.

## IV

After the jury returned a verdict of guilty on the charges of robbery in the first degree and kidnapping in the first degree, additional evidence[6] was presented to it on the second part of the information, charging the defendant with being a persistent dangerous felony offender in violation of § 53a-40.[7] The jury returned a

---

[6] The additional evidence consisted of the defendant's prior felony convictions and the time he served in connection with those convictions, in accordance with § 53a-40.

[7] General Statutes § 53a-40 provides in relevant part: "(a) A persistent dangerous felony offender is a person who: (1) (A) Stands convicted of manslaughter, arson, kidnapping, robbery in the first or second degree, or assault in the first degree, and (B) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death . . . for any of the following crimes: (i) The crimes enumerated in subparagraph (A) of this subdivision or an attempt to commit any of said crimes; or (ii) murder, sexual assault in the first or third degree . . . or an attempt to commit any of said crimes . . . or

"(2) (A) Stands convicted of sexual assault in the first or third degree, aggravated sexual assault in the first degree or sexual assault in the third degree with a firearm, and (B) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death . . . for any of the following crimes: (i) Murder, manslaughter, arson, kidnapping, robbery in the first or second degree or assault in the first degree, or an attempt to commit any of said crimes . . . .

"(h) When any person has been found to be a persistent dangerous felony offender, and the court is of the opinion that such person's history and character and the nature and circumstances of person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, shall sentence such person to a term of imprisonment not more than forty years and, if such person has, at separate times prior to the

verdict on May 12, 2004, finding him guilty of that charge.[8] On July 22, 2004, the court, at the defendant's sentencing hearing, made the following finding in accordance with § 53a-40 (h): "[Y]our character and the nature and circumstances of [your criminal] conduct causes this court to make a finding that extended incarceration will best serve the public interest." The court then sentenced the defendant to a period of incarceration of twenty-five years on the charge of robbery in the first degree and being a persistent dangerous felony offender. The defendant was also sentenced to twenty-five years on the charge of kidnapping in the first degree, and the court ordered that the sentences run consecutively, for a total effective term of fifty years incarceration.

Subsequent to the defendant's conviction, our Supreme Court decided *State* v. *Bell*, supra, 283 Conn. 748. The court concluded that "§ 53a-40 (h) is unconstitutional, to the extent that it does not provide that a defendant is entitled to have the jury make a required finding [that] expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict . . . ." (Internal quotation marks omitted.) Id., 810.

The parties filed supplemental briefs after oral argument before this court to address any issues as to the effect of *Bell* on the trial court's imposition of the

commission of the present crime, been twice convicted of and imprisoned for any of the crimes enumerated in subdivision (2) of subsection (a) of this section, sentence such person to a term of imprisonment of not more than life. . . ."

[8] The jury found that the state proved beyond a reasonable doubt that the defendant had been convicted of the crimes of kidnapping and robbery in the first degree on August 7, 1981, and sentenced to a term of imprisonment of one year or more, and that the state proved beyond a reasonable doubt that the defendant had been convicted of the crimes of robbery in the first degree and sexual assault in the first degree on November 12, 1980, and sentenced to a term of imprisonment of one year or more.

enhanced sentence on the charge of robbery in the first degree. The defendant requested review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, because, as he concedes, no issue was raised at trial with respect to his sentence. We conclude that the issue is appropriate for *Golding* review.[9]

As in *Bell*, the jury's finding of guilt in the present case and its finding of the defendant's prior felony convictions did not necessarily encompass a finding that extended incarceration would best serve the public interest. Here, the court, rather than the jury, made the requisite public interest finding. Because our Supreme Court has determined that the jury must make that finding, the defendant is entitled to a new sentencing proceeding wherein the jury shall make the determination, beyond a reasonable doubt, whether, upon consideration of the relevant factors under § 53a-40 (h), extended incarceration will best serve the public interest.[10]

The judgment of conviction is reversed only as to the sentence imposed and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[9] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 233 Conn. 239–40.

[10] Both the defendant and the state have conceded in their supplemental briefs that the case must be remanded to the trial court for a new sentencing proceeding.